**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

---

**ALI AQEEL, DWIGHT SEELEY,
PAMELA SEELEY, LAUREL READINGER,
LEVI BARTHOLOMEW, ARIJ ALI, and
MALINA ALI, individually
and on behalf of all others similarly situated,**

**Civil Action No. _____**

       **Plaintiffs,**               **JURY DEMANDED**

**v.**

**LIBERTY INSURANCE CORPORATION,
LIBERTY MUTUAL PERSONAL
INSURANCE COMPANY, and SAFECO
INSURANCE COMPANY OF INDIANA**

       **Defendants.**

---

## COMPLAINT

---

     COME NOW the Plaintiffs, Dwight Seeley, Pamela Seeley, Laurel Readinger, Levi Bartholomew, Arij Ali, Malina Ali, and Ali Aqeel (collectively "Plaintiffs"), individually and on behalf of all others similarly situated, and state and allege the following for their Complaint against Defendants Liberty Insurance Corporation ("LIC"), Liberty Mutual Personal Insurance Company ("LMPICO"), and Safeco Insurance Company of Indiana ("Safeco Indiana") (collectively hereafter "Defendants"):

## OVERVIEW OF CLAIMS

     1.     This lawsuit concerns only actual cash value ("ACV") coverage for buildings and structures. This lawsuit does not concern replacement cost value ("RCV") coverage.  All the claims

set forth in this pleading only concern property insurance coverage for structural damage (*e.g.*, homes, buildings and other structures) and *not* personal property (*e.g.*, clothes and furniture).

2.     Pursuant to Defendants' property insurance policy forms at issue, ACV payments are to be made prospectively, that is, prior to the policyholder undertaking repairs to damaged buildings and structures.  On the other hand, RCV payments are made retrospectively, after repairs have been completed.

3.     Defendants calculate ACV under the "replacement cost less depreciation" ("RCLD") methodology.  When calculating ACV for buildings and structures under the RCLD methodology, Defendants estimate the full amount of labor and new materials required to repair or replace the property, then subtract depreciation for physical deterioration.

4.     Courts in several jurisdictions hold that the RCLD methodology is reasonably intended to result in an ACV payment to the policyholder in an amount that allows the policyholder to return the damaged property to its *status quo ante*, thereby precluding the withholding of labor from ACV payments.  *See generally Mitchell v. State Farm Fire and Cas. Co.*, 954 F.3d 700, 706-07 (5th Cir. 2020).  An exception occurs—not at issue in this lawsuit—when a property insurer expressly states in its policy forms that it can withhold labor from an ACV payment.  *E.g.*, *Kurach v. Truck Ins. Exchange*, 235 A.2d 1106 (Pa. 2020).

5.     This lawsuit concerns the withholding of certain labor that Defendants, through their computerized claims estimating software, themselves determined will be incurred if the policyholders undertake repairs. However, this lawsuit does *not* concern labor that is expressly permitted to be withheld under the express terms of Defendants' insurance policies.

6.     Property insurers attach different labels to justify the withholding of certain labor from ACV payments, such as "paid when incurred" or "labor depreciation."  *E.g.*, *Mills v.*

*Foremost Ins. Co.*, 511 F.3d 1300 (11th Cir. 2008) (property insurer cannot withhold labor from ACV payments because it has not been incurred); *Mitchell*, 954 F.3d at 706-07 (property insurer cannot withhold ordinary labor from ACV payments under the auspice of "depreciation").

7.      Regardless of the artificial label affixed by the property insurer to the practice of withholding labor from an ACV payment, the result is the same—namely, a deficient ACV payment.  This lawsuit seeks to remedy the improper withholdings of labor from Plaintiffs' and class members' ACV payments.

## PARTIES, RESIDENCY, JURISDICTION AND VENUE

8.      Plaintiffs Dwight and Pamela Seeley (collectively the "Seeleys") are husband and wife.  They are citizens and residents of Franklin County, Ohio.  At all times relevant hereto, the Seeleys have owned a dwelling and other structures located at 4990 Donegal Cliffs Drive, Dublin, Ohio (the "Seeley Home").

9.      Plaintiff Laurel Readinger ("Readinger") is a citizen and resident of Cuyhoga County, Ohio.  At all times relevant hereto, Readinger owned a dwelling and other structures located at 16308 Pearldale Avenue, Cleveland, Ohio (the "Readinger Home").

10.      Plaintiff Levi Bartholomew ("Bartholomew") is a citizen and resident of Delaware County, Ohio. At all times relevant hereto, Bartholomew owned a home located at 2443 Dauer Ct., Powell, Ohio (the "Bartholomew Home").

11.      Plaintiffs Arij Ali and Malina Ali (collectively the "Alis") are husband and wife. They are citizens and residents of Cook County, Illinois.  At all times relevant hereto, the Alis have owned a dwelling and other structures at 7812 Sherwood Circle South, Hanover Park, Illinois (the "Ali Home").

3

12.     Plaintiff Ali ("Aqeel") is a citizen and resident of Rutherford County, Tennessee. At all times relevant hereto, Aqeel owned a home located at 109 Alice Avenue, Lavergne, Tennessee (the "Aqeel Home").

13.     Defendant Liberty Insurance Corporation ("LIC") is organized under the laws of the State of Illinois with its principal place of business in Boston, Massachusetts.

14.     Defendant Liberty Mutual Personal Insurance Corporation ("LMPICO") is organized under the laws of the State of Massachusetts with its principal place of business in Boston, Massachusetts.

15.     Defendant Safeco Insurance Company of Indiana ("Safeco Indiana") is organized under the laws of the State of Indiana with its principal place of business in Boston, Massachusetts.

16.     Defendants are affiliated companies within the Liberty Mutual® Insurance Group.

17.     Defendants are authorized to and do sell property insurance for buildings and structures in several states, specifically including the states of Arizona, Connecticut, Illinois, Kentucky, Maryland, Mississippi, Ohio, South Carolina, Tennessee, Utah, Vermont, Virginia, and Wisconsin.

18.     Defendants engaged in the challenged insurance coverage practices described herein in a uniform manner and pursuant to a uniform policy.

19.     The events giving rise to the individual claims asserted by Aqeel that are the subject of this action occurred in the Nashville Division of the Middle District of Tennessee. Defendants have insurance agents in the Middle District of Tennessee for the conduct of their usual and customary business, including the sale and servicing of property insurance policies.

20.     On information and belief, this Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d) ("CAFA").

4

21.      This Court has personal jurisdiction over the Defendants because they have availed themselves of the privilege of conducting business and issuing insurance contracts covering structures in Tennessee.

## FACTS

### A.  The Seeleys' Property Insurance Policy and Casualty Loss

22.      At all times relevant hereto, the Seeleys were insured pursuant to an insurance contract whereby Safeco Indiana agreed to insure, *inter alia,* the Seeley Home against property damage, bearing Policy No. OK6413463 (the "Seeley Policy").

23.      The Seeley Policy provided insurance coverage for direct physical loss to the buildings and other structures located on the insured premises, except as specifically excluded or limited by the Seeley Policy.

24.      Pursuant to the Seeley Policy, the Seeleys paid Safeco Indiana an annual premium in exchange for insurance coverage.  The required premiums were paid at all times relevant to this Complaint.

25.      On or about July 12, 2020, the Seeley Home suffered accidental direct physical loss due to a storm ("Seeley Loss").

26.      The Seeley Policy was in effect at the time of the Seeley Loss, and the Seeley Loss is compensable under the terms of the Seeley Policy.  As it relates to the Seeley Loss, there is no applicable exclusion.

27.      The Seeleys notified Safeco Indiana of the Seeley Loss and made a claim against the Seeley Policy.

28.      After its inspection, Safeco Indiana determined that the Seeley Loss was covered by the terms of the Seeley Policy.

5

29.     Safeco Indiana calculated its ACV payment obligation to the Seeleys pursuant to the RCLD methodology.

30.     The Seeley Policy does not define ACV so as to permit the labor withholdings complained of herein.

**B.  The Readinger Property Insurance Policy and Casualty Loss**

31.     At all times relevant hereto, Readinger was an insured pursuant to an insurance contract whereby LMPICO agreed to insure, *inter alia,* the Readinger Home against property damage, bearing Policy No. H3V28842947940 (the "Readinger Policy").

32.     The Readinger Policy provided insurance coverage for direct physical loss to the buildings and other structures located on the insured premises, except as specifically excluded or limited by the Readinger Policy.

33.     Pursuant to the Readinger Policy, Readinger paid LMPICO an annual premium in exchange for insurance coverage.  The required premiums were paid at all times relevant to this Complaint.

34.     On or about April 9, 2020, the Readinger Home suffered accidental direct physical loss by wind (the "Readinger Loss").

35.     The Readinger Policy was in effect at the time of the Readinger Loss, and the Readinger Loss is compensable under the terms of the Readinger Policy.  As it relates to the Readinger Loss, there is no applicable exclusion.

36.     Readinger notified LMPICO of the Readinger Loss and made a claim against the Readinger Policy.

37.     After its inspection, LMPICO determined that the Readinger Loss was covered by the terms of the Readinger Policy.

38.     LMPICO calculated its ACV payment obligation to Readinger pursuant to the RCLD methodology.

39.     The Readinger Policy does not define ACV so as to permit the labor withholdings complained of herein.

### C. The Bartholomew Property Insurance Policy and Casualty Loss

40.     At all times relevant hereto, Bartholomew was an insured pursuant to an insurance contract whereby LMPICO agreed to insure, *inter alia,* the Bartholomew Home against property damage, bearing Policy No. H3V28134252070 (the "Bartholomew Policy").

41.     The Bartholomew Policy provided insurance coverage for direct physical loss to the buildings and other structures located on the insured premises, except as specifically excluded or limited by the Bartholomew Policy.

42.     Pursuant to the Bartholomew Policy, Bartholomew paid LMPICO an annual premium in exchange for insurance coverage.  The required premiums were paid at all times relevant to this Complaint.

43.     On or about March 7, 2020, the Bartholomew Home suffered accidental direct physical loss by wind (the "Bartholomew Loss").

44.     The Bartholomew Policy was in effect at the time of the Bartholomew Loss, and the Bartholomew Loss is compensable under the terms of the Bartholomew Policy.  As it relates to the Bartholomew Loss, there is no applicable exclusion.

45.     Bartholomew notified LMPICO of the Bartholomew Loss and made a claim against the Bartholomew Policy.

46.     After its inspection, LMPICO determined that the Bartholomew Loss was covered by the terms of the Bartholomew Policy.

7

47.     LMPICO calculated its ACV payment obligation to Bartholomew pursuant to the RCLD methodology.

48.     The Bartholomew Policy does not define ACV so as to permit the labor withholdings complained of herein.

### D.  The Ali Property Insurance Policy and Casualty Loss

49.     At all times relevant hereto, the Alis were insured pursuant to an insurance contract whereby LMPICO agreed to insure, *inter alia,* the Ali Home against property damage, bearing Policy No. H3V24380218040 (the "Ali Policy").

50.     The Ali Policy provided insurance coverage for direct physical loss to the buildings and other structures located on the insured premises, except as specifically excluded or limited by the Ali Policy.

51.     Pursuant to the Ali Policy, the Alis paid LMPICO an annual premium in exchange for insurance coverage.  The required premiums were paid at all times relevant to this Complaint.

52.     On or about July 28, 2020, the Ali Home suffered accidental direct physical loss by wind (the "Ali Loss").

53.     The Ali Policy was in effect at the time of the Ali Loss, and the Ali Loss is compensable under the terms of the Ali Policy.  As it relates to the Ali Loss, there is no applicable exclusion.

54.     The Alis notified LMPICO of the Ali Loss and made a claim against the Ali Policy.

55.     After its inspection, LMPICO determined that the Ali Loss was covered by the terms of the Ali Policy.

56.     LMPICO calculated its ACV payment obligation to the Alis pursuant to the RCLD methodology.

57.     The Ali Policy does not define ACV so as to permit the labor withholdings complained of herein.

**E.  The Aqeel Property Insurance Policy and Casualty Loss**

58.     At all times relevant hereto, Aqeel was an insured pursuant to an insurance contract whereby LIC agreed to insure, *inter alia,* the Aqeel Home against property damage, bearing Policy No. H3725836928540 (the "Aqeel Policy").

59.     The Aqeel Policy provided insurance coverage for direct physical loss to the buildings and other structures located on the insured premises, except as specifically excluded or limited by the Aqeel Policy.

60.     Pursuant to the Aqeel Policy, Aqeel paid LIC an annual premium in exchange for insurance coverage.  The required premiums were paid at all times relevant to this Complaint.

61.     On or about May 3, 2020, the Aqeel Home suffered accidental direct physical loss by wind (the "Aqeel Loss").

62.     The Aqeel Policy was in effect at the time of the Aqeel Loss, and the Aqeel Loss is compensable under the terms of the Aqeel Policy.  As it relates to the Aqeel Loss, there is no applicable exclusion.

63.     Aqeel notified LIC of the Aqeel Loss and made a claim against the Aqeel Policy.

64.     After its inspection, LIC determined that the Aqeel Loss was covered by the terms of the Aqeel Policy.

65.     LIC calculated its ACV payment obligation to Aqeel pursuant to the RCLD methodology.

66.     The Aqeel Policy does not define ACV so as to permit the labor withholdings complained of herein.

**F. Defendants' Calculation of Plaintiffs' ACV Payments**

67.    In adjusting the Plaintiffs' claims, Defendants affirmatively and unilaterally chose to use the RCLD methodology to calculate the loss and make  theirACV payments.

68.    Defendants did not calculate any portion of the Plaintiffs' respective losses by reference to or analysis of any alleged increase or decrease in the market value of their respective homes, or the market value of any portion of their respective properties.  Defendants did not conduct an appraisal of the respective Plaintiffs' homes.

69.    Defendants have waived, and are estopped from asserting, any right to contend that ACV should have been calculated under any methodology other than the RCLD methodology.

70.    Defendants used commercially-available computer software called Xactimate® from Xactware Solutions, Inc. to make RCLD calculations.

71.    Defendants calculated the RCV of Plaintiffs' damaged properties through Xactimate® price lists as reflected on estimates provided to the Plaintiffs.

72.    Defendants then used the same Xactimate® price lists to calculate the depreciation for the Plaintiffs' damaged properties.

73.    Plaintiffs were each underpaid and deprived of the use of their money from the time they should have received it until the date they recovered the wrongfully withheld labor amounts, as more fully described below.

10

**G. Defendants' Practice Of Withholding Labor From ACV Payments**

74.     For the Plaintiffs and putative class members, Defendants have previously used, and continue to use through the present date, Xactimate® software to calculate ACV payments. Xactimate® is used by both insurers and contractors to calculate the cost of rebuilding or repairing damaged property and is also used to calculate depreciation to determine ACV payments under the RCLD methodology.

75.     The only methodology used by Xactimate® to calculate ACV payments for structural damage is the RCLD methodology.

76.     Defendants unfairly manipulate Xactimate® to withhold labor from ACV payments.

77.     Xactimate® generates its estimating prices from its ongoing fair market pricing research. Its price lists are both temporal (*e.g.*, monthly) and geographic (*e.g.*, city or region).

78.     When adjusting property insurance claims with Xactimate®, the property adjuster inputs, among other information, the dimensions of the damaged property, the damaged portion of the damaged property, and other objective information such as the age or condition of the roofing, siding or other damaged building materials.

79.     The Xactimate® software program then breaks down each individual necessary step in the repair process into an individual "line item." Each line item has a specific dollar value. The line items are totaled to obtain the RCV values, and then depreciation is applied.

80.     Xactimate® can be manipulated to withhold labor from ACV payments by simply checking or unchecking certain boxes concerning depreciation. For example, the below screenshot from the Xactimate® program allows the software used to select or de-select "Depreciate Non-

Material," "Depreciate Removal" or "Depreciate Overhead and Profit," all of which are labor items, and all of which will result in the withholding of labor from an ACV payment.



81.     In addition, Xactimate® can also be manipulated to withhold labor from ACV payments by failing to include corresponding line items for steep and high roofs. In Xactimate®, when there is property damage to a steep roof pitch or a high roof, Xactimate® uses two corresponding line items for the property repair. One line-item is exclusively for the additional labor costs associated with *removing* the old roofing materials. The second labor line item is exclusively for the additional labor costs to *install* new roofing materials on the steep or high roof pitch.

82.     Defendants manipulate Xactimate® to eliminate one of the two corresponding line-items for steep or high roof pitch from the Xactimate® estimates to withhold labor from ACV payments. Oftentimes, Defendants will remove the line-item surreptitiously, *i.e.*, without notifying the policyholder. Other times, Defendants will affirmatively disclose to the policyholders in the Xactimate® estimate that Defendants are withholding this labor under the auspice of "paid when incurred."

83.     Specifically, the line-item for the increased labor costs associated with removing damaged roofing materials (*e.g.*, shingle removal) from a steep pitched or high roofing surfaces is typically withheld from Xactimate® estimates prepared by Defendants. When this removal labor line item is removed from the policyholder's estimate, the monetary value as calculated by

Xactimate® is also removed, thereby withholding labor from the ACV payments made to Defendants' policyholders.

84. All Plaintiffs herein had some amount of labor withheld from their ACV payments due to Defendants' manipulation of Xactimate® as alleged above.

## THE PROPOSED CLASS ACTION DEFINITION

85. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this lawsuit as a class action on behalf of themselves and on behalf of all others similarly situated. This action satisfies the requirements of numerosity, commonality, typicality, and adequacy of representation. Only to the extent it is a requirement under applicable law, the proposed class herein is ascertainable.

86. The proposed labor withholding class that Plaintiffs seek to represent is defined as follows:

> All LIC, LMPICO and Safeco Indiana policyholders who made:
>
> (1) a structural damage claim for property located in the States of Arizona, Connecticut, Illinois, Kentucky, Maryland, Mississippi, Ohio, South Carolina, Tennessee, Utah, Vermont, Virginia, and Wisconsin; and
>
> (2) for which Defendants accepted coverage and then chose to calculate ACV through Xactimate® software; and
>
> (3) which resulted in an actual cash value payment during the class period from which labor was withheld from the policyholder due to the "manipulation of Xactimate® software" as described herein.

87. The proposed class definition, when referencing "labor," includes all labor, including but not limited to, laborer's equipment, removal labor and contractor's overhead and profit.

13

88.     In this pleading, the phrase "manipulation of Xactimate® software" means: (1) affirmative application of the "Depreciate Removal," "Depreciate Non-Material" or "Depreciate O&P" depreciation option settings; and/or (2) failure to pay for both corresponding removal and installation line items for steep or high pitched roofs when a steep or high pitched roof line item was identified as payable by Defendants' own adjusters.

89.     Included in the putative class definition are policyholders who would have received an actual cash value payment but for the withholding of labor.

90.     Members of the putative class as defined all have Article III standing as all such persons and entities, at least initially, received lower claim payments than permitted under the policy.  Certain amounts initially withheld as labor may be later repaid to policyholders upon further adjustment of the claim.  However, policyholders who have been subsequently repaid for initially withheld labor still have incurred damages, at the least, in the form of the lost "time value" of money during the period of withholding, *i.e.*, interest on the amounts improperly withheld, for the time period of withholding.

91.     Excluded from the putative class definition are: (1) all claims arising under policy forms expressly permitting the withholding of labor from ACV payments for the claim at issue within the text of the policy form; (2) any claims in which the initial ACV payment exhausted the applicable limits of insurance; (3) Plaintiffs' counsel; (4) Defendants and their affiliates; and (5) the Court to which this case is assigned and its staff.

92.     The proposed class period is the maximum limitations period as may be allowed by law.

93.     Plaintiffs reserve their right to amend, broaden, or narrow the class definition after discovery.

## AMOUNT IN CONTROVERSY

94.     Upon information and belief, the amount in controversy with respect to the proposed class exceeds $5,000,000, exclusive of interest and costs.

## CLASS ACTION ALLEGATIONS

95.     The members of the proposed class are so numerous that joinder of all members is impracticable. Plaintiffs reasonably believe that hundreds or thousands of people geographically dispersed across Arizona, Connecticut, Illinois, Kentucky, Maryland, Mississippi, Ohio, South Carolina, Tennessee, Utah, Vermont, Virginia, and Wisconsin have been damaged by Defendants' actions.  The names and addresses of the members of the proposed class are readily identifiable through records maintained by Defendants or from information readily available to Defendants.

96.     The relatively small amounts of damage suffered by most members of the proposed class make filing separate lawsuits by individual members economically impracticable.

97.     Defendants have acted on grounds generally applicable to the proposed class in that Defendants routinely withheld labor costs as described herein in their adjustment of property damage claims under their policies of insurance.  It is reasonable to expect that Defendants will continue to withhold labor to reduce the amount they pay to their insureds under these policies absent this lawsuit.

98.     Common questions of law and fact exist as to all members of the proposed class and predominate over any questions affecting only individual members. The questions of law and fact common to the proposed class include, but are not limited to:

a.      Whether Defendants' policy language allows them to withhold labor costs in their calculation of ACV payments;

b.      Whether Defendants' policy language is ambiguous concerning the withholding of labor costs in calculating ACV payments, and, if so, how Defendants' insurance policies should be interpreted;

15

c. Whether Defendants' withholding of labor costs in their calculation of ACV payments breaches the insurance policies;

d. Whether Defendants have a custom and practice of withholding labor costs in their calculation of ACV payments;

e. Whether Plaintiffs and members of the proposed class have been damaged as a result of Defendants' withholding of labor costs in their calculation of ACV payments;

f. Whether Plaintiffs and members of the proposed class are entitled to a declaration, as well as potential supplemental relief, under the Declaratory Judgment Act; and

g. Whether Plaintiffs and members of the proposed class are entitled to equitable relief in the form of specific performance, unjust enrichment, declaratory relief or restitutionary damages.

99. Plaintiffs' claims are typical of the claims of the proposed class members, as they were adversely affected by Defendants' custom and practice concerning the withholding of labor. Further, Plaintiffs' claims are typical of the claims of the proposed class members because their claims arise from the same practices and course of conduct (*i.e*., the manipulation of Xactimate® software to withhold labor) that give rise to the claims of the members of the proposed class and are based on the same factual and legal theories. Plaintiffs are not different in any material respect from any other member of the proposed class.

100. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the proposed class. Plaintiffs' interests do not conflict with the interests of the proposed class they seek to represent. Plaintiffs have retained lawyers who are competent and experienced in class action and insurance litigation. Plaintiffs and Plaintiffs' counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the members of the proposed class and

will diligently discharge those duties by vigorously seeking the maximum possible recovery for the Class while recognizing the risks associated with litigation.

101.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Joining all proposed members of the proposed class in one action is impracticable and prosecuting individual actions is not feasible. The size of the individual claims is likely not large enough to justify filing a separate action for each claim. For many, if not most, members of the proposed class, a class action is the only procedural mechanism that will afford them an opportunity for legal redress and justice. Even if members of the proposed class had the resources to pursue individual litigation, that method would be unduly burdensome to the courts in which such cases would proceed. Individual litigation exacerbates the delay and increases the expense for all parties, as well as the court system. Individual litigation could result in inconsistent adjudications of common issues of law and fact.

102.     In contrast, a class action will minimize case management difficulties and provide multiple benefits to the litigating parties, including efficiency, economy of scale, unitary adjudication with consistent results and equal protection of the rights of Plaintiffs and members of the proposed class. These benefits would result from the comprehensive and efficient supervision of the litigation by a single court.

103.     Questions of law or fact common to Plaintiffs and members of the proposed class, including those identified above, predominate over questions affecting only individual members (if any), and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Class action treatment will allow a large number of similarly situated consumers to prosecute their common claims in a single forum, simultaneously, efficiently, and without the necessary duplication of effort and expense that numerous individuals

would require. Further, the monetary amounts due to many individual members of the proposed class are likely to be relatively small, and the burden and expense of individual litigation would make it difficult or impossible for individual members of the proposed class to seek and obtain relief. On the other hand, a class action will serve important public interests by permitting consumers harmed by Defendants' unlawful practices to effectively pursue recovery of the sums owed to them, and by deterring further unlawful conduct. The public interest in protecting the rights of consumers favors disposition of the controversy in the class action form.

104.    Class certification is further warranted because Defendants have acted or refused to act on grounds that apply generally to the class, so final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

105.    Plaintiffs may seek, in the alternative, certification of an issues class.

106.    Rule 23(c)(4) provides that an action may be brought or maintained as a class action with respect to particular issues when doing so would materially advance the litigation as a whole.

## COUNT I
## BREACH OF CONTRACT

107.    Plaintiffs restate and incorporate by reference all preceding allegations.

108.    Defendants entered into policies of insurance with Plaintiffs and members of the proposed class. These insurance policies govern the relationship between Defendants, Plaintiffs, and members of the proposed class, as well as the manner in which claims for covered losses are handled.

109.    The policies of insurance between Defendants and Plaintiffs and the other members of the proposed class are binding contracts under applicable law and are supported by valid consideration in the form of premium payments in exchange for insurance coverage.

18

110. Defendants drafted the insurance policies at issue, which are essentially identical in all respects material to this litigation.

111. To receive ACV claim payments, Plaintiffs complied with all material provisions and performed all their respective duties with regard to their insurance policy.

112. At all times relevant hereto, Defendants' custom and practice has been, and is, to make such payments based upon Defendants' calculation of the ACV through Xactimate® using the RCLD methodology.

113. Defendants breached their contractual duties to pay Plaintiffs and members of the proposed class the labor necessary to return damaged property to its *status quo ante* by withholding labor from their respective ACV payments under the RCLD methodology.

114. Defendants' actions in breaching their contractual obligations to Plaintiffs and members of the proposed class benefitted and continue to benefit Defendants. Likewise, Defendants' actions damaged and continue to damage Plaintiffs and members of the proposed class.

115. Additionally, Defendants breached their contractual duties to Plaintiffs by failing and refusing to promptly pay the amounts individually owed to Plaintiffs as required by the terms of their respective policies of insurance. As a result, Plaintiffs have been damaged in the amount of the unpaid portion of their claims, including all such amounts that should have been paid by Defendant as a result of the subject losses.

116. Defendants' actions in breaching their contractual obligations, as described herein, are the direct and proximate cause of damages to Plaintiffs and members of the proposed class.

117.    Given the foregoing, Plaintiffs and members of the proposed class are entitled to recover damages sufficient to indemnify them for the unlawfully withheld labor from their ACV payments.

118.    Plaintiffs and members of the proposed class seek any and all relief as may be permitted under applicable law to remedy the ongoing breaches of contract.

**COUNT II**
**DECLARATORY JUDGMENT AND RELIEF**

119.    Plaintiffs restate and incorporate by reference all preceding allegations.

120.    This Court is empowered by the Declaratory Judgment Act as codified at 28 U.S.C. § 2201 and Fed. R. Civ. P. 57 to declare the rights and legal relations of parties regardless of whether further relief is or could be claimed.

121.    A party may seek to have insurance contracts, before or after a breach, construed to obtain a declaration of rights, status, and other legal relations thereunder adjudicated.

122.    Plaintiffs and members of the class have complied with all relevant conditions precedent in their contracts.

123.    Plaintiffs seek, personally and on behalf of the proposed class, a declaration that Defendants' property insurance contracts prohibit the withholding of labor costs as described herein when adjusting losses under the RCLD methodology employed here.

124.    Plaintiffs further seek, personally and on behalf of the proposed class, any and all equitable relief available under the law that the Court deems necessary and proper to the administration of justice, including, but not limited to, identifying and locating policyholders, and notifying the same of the circumstances complained of and the restoration of their rights and remediation of their losses, and preclusion of Defendants from engaging in the conduct described herein, as may be permitted by law.

20

125.      Plaintiffs and members of the proposed class have suffered injuries.

## JURY DEMAND

Plaintiffs demand a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that this Court:

1.      Enter an order certifying this action as a class action, appointing all Plaintiffs as the representatives of the proposed class and appointing Plaintiffs' attorneys as counsel for the class;

2.      Enter a declaratory judgment, declaring that Defendants' withholding of labor costs as alleged herein is contrary to and breaches the insurance policies issued to Plaintiffs and members of the class;

3.      Enter a preliminary and permanent injunction and equitable relief against Defendants and their officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in each of the policies, practices, customs, and usages complained of herein;

4.      Enter an order that Defendants specifically perform and carry out policies, practices, and programs that remediate and eradicate the effects of their past and present practices complained of herein;

5.      Award compensatory damages for all sums withheld as labor costs under the policies, plus prejudgment interest on all such sums, to Plaintiffs and members of the proposed class;

6.      Award compensatory damages to Plaintiffs for all amounts to which they are entitled pursuant to the subject insurance policies as a result of Plaintiffs' respective losses;

7.     Award costs, expenses, and disbursements incurred herein by Plaintiffs and members of the proposed class;

8.     Pre- and Post-Judgment interest; and

9.     Grant such further and additional relief as the Court deems necessary and proper.

Respectfully submitted,

_/s/ J. Brandon McWherter_____
J. BRANDON McWHERTER
(TN Bar # 21600)
**McWherter Scott Bobbitt PLC**
341 Cool Springs Blvd., Suite 230
Franklin, TN  37067
(615) 354-1144
brandon@msb.law

ERIK D. PETERSON (KY Bar 93003)*
**Mehr, Fairbanks & Peterson**
 **Trial Lawyers, PLLC**
201 West Short Street, Suite 800
Lexington, Kentucky 40507
(859) 225-3731
edp@austinmehr.com

T. JOSEPH SNODGRASS
 (MN Bar #231071)*
**Larson • King, LLP**
30 E. 7th Street, Suite 2800
St. Paul, MN 55101
(651) 312-6500
jsnodgrass@larsonking.com

*Attorneys for Plaintiffs and*
*Putative Class Representative*

**\*to be admitted *pro hac vice***